UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TODD COURSER,

        Plaintiff,

v.                                                                      Case No. 1:18-CV-882

MICHIGAN HOUSE OF                                HON. GORDON J. QUIST
REPRESENTATIVES, et al.,

        Defendants.

_____/

## OPINION REGARDING DEFENDANTS' MOTIONS TO DISMISS AND PLAINTIFF'S MOTION FOR RULE 37(e) SANCTIONS

### I. OVERVIEW

Plaintiff, Todd Courser, a former member of Michigan's House of Representatives, claims that he and his colleague, former Representative Cindy Gamrat,[1] were victims of a political conspiracy designed to squelch their voices within the Republican Caucus, eventually have them removed from office, and, as to Courser, subject him to criminal charges, all because they refused to sign the Republican Caucus Pledge. Courser says that the individual Defendants, Kevin Cotter, Tim Bowlin, Brock Swartzle, Norm Saari, Edward McBroom, and Hassan Beydoun (collectively the House Defendants), conspired with Keith Allard, Benjamin Graham, and Josh Cline—three legislative aides assigned to Courser's and Gamrat's staffs[2]—and Gamrat's then-husband, Joe Gamrat, and his friends, David Horr and Vincent Krell, to conduct illegal surveillance,

---

[1] Cindy Gamrat now uses the name Cindy Bauer, as referenced in Courser's First Amended Complaint. For consistency, the Court will refer to Bauer as Gamrat—the name she used during the events in question.

[2] Courser alleges throughout the amended complaint that Allard, Graham, and Cline were "Defendants' employees," but as Courser admits, Allard, Graham, and Cline were employed by the House, not by the individual Defendants. (ECF No. 33 at PageID.402.)

wiretapping, and extortive acts in order to "dig up dirt" on Courser and Gamrat. Courser alleges that Defendants' activities gave rise to a host of violations of federal and state laws.

Reality, as we know from Courser's and Gamrat's own admissions, as well as public hearings and investigations, is much different. In fact, soon after Courser and Gamrat took office, Allard, Graham, and, to a lesser extent, Cline, began complaining to House leadership staff that Courser and Gamrat were requiring them to devote House work time to Courser's and Gamrat's political and personal tasks. Complicating matters further, Courser and Gamrat were engaged in an extramarital sexual relationship, which they hid in plain sight from Allard, Graham, Cline, and Joe Gamrat. The affair led to the now well-known "inoculate the herd" conversation between Courser and Graham in May of 2015 and Graham's recording of the conversation; Courser's subsequent false-flag-gay-sex email to his constituents; the August 7, 2015, *Detroit News* article reporting on the affair and Courser's and Gamrat's use of public funds to hide it; House investigations into the matter; and, eventually, Courser's resignation and Gamrat's expulsion.

This is Courser's second go-around in this Court. In 2016, Courser filed a complaint against the House Defendants, Allard, Graham, and Cline, and numerous other defendants alleging violations of federal and state law (*Courser I*). After several defendants filed motions to dismiss, and facing an imminent response deadline, Courser amended his complaint and, minutes later, voluntarily dismissed his complaint. *See Courser v. Allard*, *et al.*, No. 1:16-CV-1108 (W.D. Mich.), ECF Nos. 121, 123. Courser returned about eighteen months later, separating his prior lawsuit into three separate cases, including the instant case against the House Defendants.

Courser's First Amended Complaint, which is the subject of this Opinion, like all of Courser's prior pleadings in his cases before this Court, is massive—148 pages, 676 paragraphs, and 18 counts—stretching Federal Rule of Civil Procedure Rule 8(a)(2)'s command that a pleading contain "a short and plain statement of the claim" to a point beyond all possible recognition.

Invoking federal law, Courser alleges claims pursuant to 42 U.S.C. §§ 1983 and 1985; the federal wiretapping act, known as the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510–2522; the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962; and a claim that Article IV, § 16 of the Michigan Constitution is unconstitutionally vague.  Courser alleges state-law claims for violation of the Fair and Just Treatment Clause of the Michigan Constitution; violation of the Michigan Fraudulent Access to Computers, Computer Systems, and Computer Networks Act, M.C.L. § 752.791; libel, slander, and defamation; civil stalking; invasion of privacy and intrusion upon seclusion; tortious interference with business relationships; intentional infliction of emotional distress; negligence and negligent infliction of emotional distress; indemnification pursuant to M.C.L. § 691.1408; fraudulent misrepresentation; intentional interference with or destruction of evidence and spoliation; and conspiracy and concert of action.

The House Defendants have filed motions to dismiss, in which they argue that Courser's claims are barred by Eleventh Amendment immunity, legislative immunity, qualified immunity and, as to the state-law tort claims, governmental immunity.[3]  The House Defendants further argue that, notwithstanding the First Amended Complaint's heft, it fails to state a claim, and at least some of Courser's claims are time-barred.  The Court heard oral argument on the motions on June 11, 2019, and the motions are ready for decision.

For the reasons that follow, the Court will grant the House Defendants' motions.  In addition, the Court will deny Courser's motion for sanctions pursuant to Rule 37 based on Defendants' alleged destruction of evidence and spoliation of evidence.

---

[3] The House and Defendants Cotter, Bowlin, McBroom, Swartzle, and Beydoun filed a motion, and Defendant Saari, through separate counsel, filed his own motion.  (ECF Nos. 40 and 41.)  Defendant Swartzle joined Defendant Saari's reply.

## II. BACKGROUND

In November 2014, Gamrat and Courser were elected, respectively, as the State Representatives of Michigan's 80th House District and Michigan's 82nd House District. Keith Allard volunteered and served on Courser's political campaign. In addition, Benjamin Graham and Josh Cline were paid political consultants and served on Courser's campaign. (ECF No. 33 at Page ID.401.) In January 2015, Allard, Graham, and Cline were officially employed by the House. (*Id.* at PageID.402.) On January 2, 2015, the House assigned Allard to Gamrat's office and assigned Graham and Cline to Courser's office. (*Id.*)

At the time Courser and Gamrat took office, Defendants Cotter and McBroom were State Representatives, and Cotter was also the Speaker of the House. Defendant Bowlin was the Business Director and Chief Financial Officer for the House, Defendant Swartzle was the House General Counsel, Defendant Saari was Cotter's Chief of Staff, and Defendant Beydoun was the House Majority Legal Counsel. (*Id.* at PageID.393.)

Following the election, Gamrat and Courser agreed to a staff-sharing arrangement in which Allard, Graham, and Cline served as staff members in both districts and worked out of both Gamrat's and Courser's separate offices. (*Id.* at PageID.408.) From the beginning of their tenures as Representatives, Gamrat and Courser carried on an extramarital sexual relationship. Around the same time—January 2015—Allard, Graham, and Cline began meeting with Defendants Saari and Swartzle to issue reports on Courser and Gamrat. Courser claims that the purpose of these reports was to erode Courser's "credibility and effectiveness as a State Representative, and to force his vote according to COTTER's wishes." (*Id.* at PageID.405.) One such report included an incident in May 2015 in which Courser asked Graham to disseminate a "false flag" email designed as a "controlled burn" to "inoculate the herd." The email that Courser or someone on his behalf had authored contained a number of outlandish, untrue, and salacious allegations about Courser.

4

Courser hoped that the email would create such a stir that any real information that came out about his affair with Gamrat would be ignored as an exaggeration or seen as a smear campaign. Graham refused to send the email, but Courser found someone else to send it. (ECF No. 28-5 at PageID.326–27.)

On July 6, 2015, Bowlin terminated Allard's and Graham's employment, apparently at the behest of Courser and Gamrat. (ECF No. 33 at PageID.411.) After Bowlin implemented the termination, Allard and Graham told Bowlin about their prior reports to Swartzle and Saari regarding Courser and Gamrat's affair and other misconduct. When the House leadership did not investigate, Allard and Graham provided their information, including an edited version of the audio recording of Graham's "false flag" conversation with Courser, to the *Detroit News*. On August 7, 2015, the *Detroit News* ran a story about Courser and Gamrat's sexual relationship and Courser's "false flag" email, as well as Courser's and Gamrat's misuse of taxpayer money to cover up their affair. The same day the *Detroit News* article ran, Cotter requested and directed Bowlin and the House Business Office (HBO) to investigate and prepare a report on Courser's and Gamrat's alleged misconduct. (ECF No. 28-5 at PageID.322.)

On August 31, 2015, the HBO issued a report that concluded further investigation by the House was warranted. On August 19, 2015, before Bowlin had completed the HBO report, the House adopted Resolution 129 to form a Select Committee to examine the qualifications of Gamrat and Courser and to determine their fitness to continue holding office. The Select Committee was composed of six members, four from the Republican Caucus and two from the Democratic Caucus. Defendant McBroom chaired the Select Committee.

On September 8, 2015, the HBO and the Office of the General Counsel issued a "Combined Statement," which set forth the facts uncovered during the investigation.[4] The Combined

---

[4] Available at http://house.michigan.gov/sessiondocs/2015-2016/testimony/Committee389-9-8-2015-3.pdf.

Statement concluded with the recommendation that Courser be expelled and that Gamrat not be expelled but censured with severe conditions attached.  (Combined Statement at 32.)  On September 11, 2015, Courser resigned from the House before the House could act on the Select Committee's recommendation.  (ECF No. 33 at PageID.455.)  The full House voted to expel Gamrat the same day.

On or about August 2, 2015, Defendant Saari left his position as Cotter's Chief of Staff to assume the office of a Commissioner of the Public Service Commission, pursuant to an appointment by then-Governor Rick Snyder.  (ECF No. 40-4.)  Thus, after that time, Saari was not involved in House affairs or the Courser investigation (other than being interviewed as a witness during the HBO investigation).

### III.  MOTION STANDARD

Pursuant to Federal Rule of Civil 8(a), a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief."  Detailed factual allegations are not required, but "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' required more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964–65 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103 (1957)).  The court must accept all of the plaintiff's factual allegations as true and construe the complaint in the light most favorable to the plaintiff.  *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcoft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).  Although the plausibility standard is not equivalent to a "'probability

requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965).  "[W]here the well-pleaded facts do not permit the court to infer more than a sheer possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief."  *Id.* at 679, 129 S. Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

In general, in deciding a Rule 12(b)(6) motion to dismiss the court is limited to considering only the pleadings.  *See Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673, 682 (6th Cir. 2011) (noting that "Rule 12(b)(6) scrutiny is limited to the pleadings").  However, without converting the motion to one for summary judgment under Rule 56, a court may also consider "any exhibits attached [to the Complaint], public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).  Such items include, but are not limited to, the HBO report and materials generated during the HBO investigation and the Select Committee proceeding.

## IV. DISCUSSION

### A.    Immunity

The House Defendants argue all or most of Courser's claims are barred by various immunities.

#### 1.    Eleventh Amendment Immunity

The House Defendants first argue that they are entitled to sovereign immunity under the Eleventh Amendment, *i.e.*, a state and its agencies are generally immune from private lawsuits in federal court.  *Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S. Ct. 568, 572 (1977).  The state legislature is an arm of the State.  Mich. Const. art. IV, § 1. Because Courser fails to show that Michigan has waived its Eleventh Amendment immunity as to any claim, his

claims against the House are barred by the Eleventh Amendment. *See Harnden v. Mich. Dep't of Human & Health Servs.*, No. 17-2022, 2018 WL 1956011, at *1 (6th Cir. Mar. 5, 2018) ("The State of Michigan has not waived its sovereign immunity or consented to be sued in federal court." (citing *Johnson v. Dellatifa*, 357 F.3d 539, 545 (6th Cir. 2004)). In addition, a suit against a state officer in his or her official capacity is deemed a suit against the state. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312 (1989). Thus, Courser's claims against the individual Defendants in their official capacities are barred as well.[5]

Courser's First Amended Complaint—steeped in conspiracy allegations—is a prime example of a tactic known as group pleading. As one court has explained, "[a] complaint which lumps all defendants together and does not sufficiently allege who did what to whom, fails to state a claim for relief because it does not provide fair notice of the grounds for the claims made against a particular defendant." *Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 831 (D. Minn. 2012). With the exception of his fraudulent misrepresentation claim in Count 14 against Swartzle and Beydoun, all of Courser's claims are against "Defendants" or "Defendants and their employees" ("employees" referring to Allard, Graham, and Cline, who, Courser admits, were employees of the House, not the individual Defendants) without delineating what each Defendant did to violate Courser's rights. Regardless, three claims in particular stand out as being properly asserted only against the House and, therefore, subject to dismissal to total dismissal on Eleventh Amendment grounds.

First, Count 3 alleges that Article IV, § 16 of the Michigan Constitution is unconstitutionally vague. That section states:

---

[5]Courser argues that his claims against the House Defendants in their official capacities are not barred because they were not acting as state officials, but as members of the Republican Caucus. (ECF No. 48 at PageID.2458.) This argument is meritless because it fails to recognize that elected officials wear two hats—party members and elected office holders. Courser's factual allegations show that, at all times during the investigation and hearings, the House Defendants acted within their roles as state officials.

> Each house, except as otherwise provided in this constitution, shall choose its own officers and determine the rules of its proceedings, but shall not adopt any rule that will prevent a majority of the members elected thereto and serving therein from discharging a committee from the further consideration of any measure. Each house shall be the sole judge of the qualifications, elections and returns of its members, and may, with the concurrence of two-thirds of all the members elected thereto and serving therein, expel a member. The reasons for such expulsion shall be entered in the journal, with the votes and names of the members voting upon the question. No member shall be expelled a second time for the same cause.

The House Defendants offer a number of persuasive arguments why this claim fails, including that Courser lacks Article III standing to assert it because, as Courser resigned his office, the House never applied this provision to him. But the claim is subject to dismissal on an even more fundamental level. Courser alleges this claim against all Defendants, but he does not explain why. For example, Saari, Bowlin, Swartzle, and Beydoun were not even legislators who could have voted on expulsion, so Courser has no basis to sue them. Moreover, had Courser been expelled, it would have occurred only by the vote of the entire House because only two-thirds of the members of the House can apply this provision. This claim, to the extent it is valid, is against only the House.[6]

Second, in Count 4, Courser alleges that the House Defendants' investigation and hearing on his misconduct violated the Fair and Just Treatment clause of Michigan's Constitution, which provides:

---

[6] The House Defendants note that no case has apparently ever applied the void-for-vagueness doctrine to a provision of a state constitution delineating the powers of a branch of government, and Courser cites no case to that effect. Indeed, "the void-for-vagueness doctrine is principally employed in the interpretation and application of criminal statutes . . . [and] is also relevant in considering legislation imposing civil sanctions." *Boutilier v. INS*, 363 F.2d 488, 495 (2d Cir. 1966). As the Ninth Circuit has observed: "Vague statutes are objectionable for three primary reasons. First, they trap the innocent by not providing fair warning. Second, they impermissibly delegate basic policy matters to lower level officials for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, when vague statutes involve sensitive areas of First Amendment freedoms, they operate to inhibit the exercise of those freedoms." *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001). Here, we are dealing with a provision of the Michigan Constitution that does not impose criminal liability, does not have a civil penalty provision, and does not regulate speech in any manner. Accordingly, the void-for-vagueness doctrine has no application. *See Does v. Mills*, No. 04 Civ. 2010(RWS), 2005 WL 900620, at *10 (S.D.N.Y. Apr. 18, 2005) ("The regulations here are not criminal laws. They do not proscribe conduct protected by the First Amendment. Nor do they impose civil sanctions for certain types of conduct. Therefore, the void-for-vagueness doctrine is not applicable.").

> . . . .  The right of all individuals, firms, corporations and voluntary associations to
> fair and just treatment in the course of legislative and executive investigations and
> hearings shall not be infringed.

Mich. Const. art. 1, § 17.  In *Smith v. Department of Public Health*, 428 Mich. 450, 410 N.W.2d

749 (1989), *affirmed sub nom Will v. Michigan Department of State Police*, 491 U.S. 58, 109 S.

Ct. 2304 (1989), the Michigan Supreme Court said that a plaintiff seeking damages under

Michigan's Constitution—as Courser does here—may sue only the State and its officials in their

official capacities.  Under *Smith*, Courser's claim under the Fair and Just Treatment Clause is

proper only against the House and its officials in their official capacities and, therefore, is barred

in this Court by the Eleventh Amendment.

Finally, in Count 13, Courser alleges a claim for indemnification under M.C.L.

§ 691.1408(1) for the expenses he incurred in connection with the state-court criminal prosecution

and the whistleblower lawsuit that Allard and Graham filed against Courser.  Section 691.1408

applies only to "a government agency," defined as the State of Michigan or a political subdivision.

M.C.L. § 691.1401(a).  As no individual House Defendant qualifies as a "governmental agency,"

Courser's claim for indemnification can only be against the House, or perhaps against Cotter in

his official capacity as Speaker.  Either way, the Eleventh Amendment bars the claim.  *Pennhurst*

*State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101–02, 104 S. Ct. 900, 908–09 (1984); *see Emery*

*v. Mich. Dep't of Civil Rights*, No. 15-11467, 2016 WL 1090429, at *4–6 (E.D. Mich. Mar. 21,

2016) (dismissing the plaintiff's state-law claims against the Michigan Department of Civil Rights

and individual defendants in their official capacities as barred by the Eleventh Amendment).

Citing *Martin v. Wood*, 772 F.3d 192 (4th Cir. 2014), the individual House Defendants

argue, as they did in *Gamrat v. Allard*, 320 F. Supp. 3d 927, 935 n.2 (W.D. Mich. 2018), that

Courser's claims against them in their individual capacities are barred by the Eleventh Amendment

because Courser's own allegations make clear that his claims are based on actions the individual

10

House Defendants took in their official capacities. However, "[t]he eleventh amendment does not prevent plaintiffs from bringing suits for money damages against state officials provided that the defendants are sued in their individual capacities." *Foulks v. Ohio Dep't of Rehab. & Corr.*, 713 F.2d 1229, 1233 (6th Cir. 1983) (citing, among others, *Scheuer v. Rhodes*, 416 U.S. 232, 237–38, 94 S. Ct. 1683, 1686-87 (1974)). In *Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358 (1991), the Supreme Court rejected essentially the same argument the House Defendants raise in this case, that "officials may not be held liable in their personal capacity for actions they take in their official capacity." *Id.* at 27, 112 S. Ct. at 363. The Court said that such a theory "would absolutely immunize state officials from personal liability for acts within their authority and necessary to fulfilling governmental responsibilities." *Id.* at 28, 112 S. Ct. at 363. Moreover, as this Court noted in *Gamrat*, *Martin* was a Fair Labor Standards Act case, not a § 1983 case. And, the Fourth Circuit has held that *Martin* does not apply to § 1983 claims, precisely because applying *Martin* to such claims would be at odds with *Hafer*. *Adams v. Ferguson*, 884 F.3d 219, 225 (4th Cir. 2018).[7]

### 2. Legislative Immunity

The House Defendants next argue that they are entitled to legislative immunity. Pursuant to the Speech or Debate Clause, U.S. Const. art I, § 6, defendants who engage in legislative activities are absolutely immune from suit in their individual capacities. The Speech or Debate Clause provides that "for any Speech or Debate in either House, [members of Congress] shall not be questioned in any other place." The Speech or Debate Clause serves "to prevent intimidation by the executive and accountability before a possibly hostile judiciary." *United States v. Johnson*, 383 U.S. 169, 181, 86 S. Ct. 749, 755 (1966). The clause provides protection not "simply for the

---

[7] The other side of the coin is that a plaintiff asserting a § 1983 claim against a defendant in his individual capacity must allege that defendant's personal involvement in the violation. *See Miller v. Calhoun Cty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005). Courser fails to do this. As noted above, for the most part, Courser simply lumps all House Defendants together as a group and claims they engaged in wrongdoing. For example, what did Defendants Saari, Bowlin, Swartzle, or Beydoun, who were not even legislators and could not have voted to remove him, do to violate Courser's constitutional rights?

personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators." *United States v. Brewster*, 408 U.S. 501, 507, 92 S. Ct. 2531, 2135 (1972). Although the federal Speech or Debate Clause does not protect state legislators, Michigan has such a clause in its Constitution, and the Supreme Court has extended legislative immunity to state and local legislative bodies. *Tenney v. Brandhove*, 341 U.S. 367, 376, 71 S. Ct. 783, 788 (1951).

"Absolute legislative immunity attaches to all actions taken in the sphere of legitimate legislative activity." *Bogan v. Scott-Harris*, 523 U.S. 44, 54, 119 S. Ct. 966, 972 (1998) (internal quotation marks omitted). To determine whether an act falls within this sphere, a court must examine "the nature of the act, rather than . . . the motive or intent of the official performing it." *Id.*, 118 S. Ct. at 973. The question is whether the activity is

> 'an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.'

*Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504, 95 S. Ct. 1813, 1821–22 (1975) (quoting *Gravel v. United States*, 408 U.S. 606, 625, 92 S. Ct. 2614, 2627 (1972)).

Apart from words spoken in a debate, the Speech or Debate clause covers "written reports presented in that body by its committees, to resolutions offered, which, though in writing, must be reproduced in speech, and to the act of voting." *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880). In addition, "committee hearings are protected, even if held outside the Chambers." *Hutchinson v. Proxmire*, 443 U.S. 111, 124, 88 S. Ct. 2675, 2683 (1979); *see Walker v. Jones*, 733 F.2d 923, 929 (D.C. Cir. 1984) (noting that legislative activity includes "participation in committee investigations, proceedings, and reports"). In addition, legislative immunity extends beyond legislators to legislative aids and counsel. *Eastland*, 421 U.S. at 507, 95 S. Ct. at 1823; *see Ellis v. Coffee Cty. Bd. of Registrars*, 981 F.2d 1185, 1190 (11th Cir. 1993) ( noting that "[t]he Supreme

12

Court has extended this privilege to the chief counsel of a congressional subcommittee; committee staff, consultants, investigators, and congressional aids, insofar as they are engaged in legislative functions").

### 3.    Qualified Immunity

Next, the House Defendants argue that they are entitled to qualified immunity on all of Courser's federal claims.  "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)).   Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant official violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)).   The analysis entails a two-step inquiry.   *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).  First, the court must "determine if the facts alleged make out a violation of a constitutional right."  *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 815–16 (1982).  Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable offic[ial] would have known that his conduct violated it."  *Id.* (citing *Pearson*, 555 U.S. at 232, 129 S. Ct. at 816).  A court may address these steps in any order.  *Id.* (citing *Pearson*, 555 U.S. at 236, 129 S. Ct. at 818).  Thus, an official is entitled to qualified immunity if either step of the analysis is not satisfied.  *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

4.      **Governmental Immunity**

Finally, the House Defendants argue that they are entitled to governmental immunity as to Courser's state-law tort claims.  Pursuant to M.C.L.§ 691.1407(5), a legislator is "immune from tort liability for injuries to persons . . . if he or she is acting within the scope of his or her . . . legislative . . . authority."  This immunity extends to both negligent and intentional torts.  *Moffit v. Fageman*, No. 1:18-cv-916, 2018 WL 4328017, at *4 (W.D. Mich. Sept. 11, 2018) (citing *Bischoff v. Calhoun Cty. Prosecutor*, 173 Mich. App. 802, 806, 434 N.W.2d 249, 251 (1988)).  Lower-level employees are entitled to immunity for intentional acts if the following are established: "(a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority, (b) the acts were taken in good faith, or were not undertaken with malice, and (c) the acts were discretionary, as opposed to ministerial."  *Odom v. Wayne Cty.*, 482 Mich. 459, 480, 760 N.W.2d 217, 228 (2008).

The Court will address the application of legislative, qualified, and governmental immunities, as applicable, to each claim below.

**B.      Failure to State a Claim**

1.      **Conspiracy and Concert of Actions**

Count 18, Courser's final claim, alleges conspiracy and concert of actions by all House Defendants.  The Court begins with this claim because it is the cornerstone of Courser's First Amended Complaint.  The conspiracy count itself is bereft of factual content; it consists entirely of legal conclusions.  However, it is clear from the remainder of the First Amended Complaint that Courser contends that the House Defendants conspired with Allard, Graham, Cline, and Joe Gamrat (and by extension, Joe Gamrat's associates, Vincent Krell and David Horr) and that the acts of Allard, Graham, and Cline and Joe Gamrat and his friends are thus imputed to the House Defendants.

14

"In Michigan, a claim for civil conspiracy requires a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Specialized Pharmacy Servs., Inc. v. Magnum Health & Rehab of Adrian, LLC*, 2013 WL 1431722, at *4 (E.D. Mich. Apr. 9, 2013) (citation omitted). Conspiracy claims must be pled with some degree of specificity. *Moldowan v. City of Warren*, 578 F.3d 351, 395 (6th Cir. 2009).  Thus, vague and conclusory allegations without supporting facts will not do.  *Id.*  The doctrine of concert of action presents a separate basis for liability and applies when a plaintiff shows "that all defendants acted tortiously pursuant to a common design." *Abel v. Eli Lilly & Co.*, 418 Mich. 311, 338, 343 N.W.2d 164, 176 (1984).

Initially, the Court notes that Courser's conspiracy and concert of action claim is not only implausible, but absurd on its face.  The alleged purpose of the conspiracy or the common design was to dig up dirt on Courser and Gamrat to reign them in/undermine their effectiveness as Representatives because they refused to sign the Republican Caucus Pledge and toe the party line. According to Courser, he and Gamrat stood in the way of the House Republicans' agenda.  But, as the House Defendants note, in 2015, Courser's and Gamrat's votes had no meaningful impact on the Republicans' ability to pass legislation because the House Republican Caucus had 63 members—more than enough to pass legislation without votes from Democrats or Courser and Gamrat.  The House Defendants thus had no reason to undermine Courser's and Gamrat's effectiveness.  In addition, nothing in the First Amended Complaint suggests that Joe Gamrat and David Horr, who the Michigan State Police concluded sent the extortion texts to Courser and Gamrat,[8] acted pursuant to an agreement or common design with the House Defendants.  Joe

---

[8] Whether a police report may be considered a public record on a motion to dismiss is an open question, with most courts holding that a police report is not a public record.  *See Eubank v. Wesseler*, No. 10-210-DLB-JGW, 2011 WL 3652558, at *3 n.2 (E.D. Ky. Aug. 19, 2011) ("The vast majority of cases hold that police reports do not constitute matters of public record appropriate for judicial notice.").  Regardless, Courser references the Michigan State Police report concerning his extortion complaint in several paragraphs of his First Amended Complaint and cites statements that the House Defendants, Allard, Graham, and Cline made during the Michigan State Police interviews.  (*See e.g.*,

Gamrat, understandably upset that his wife was having an affair, was working with assistance from his friends to end it.  In contrast, the exhibits Courser attaches to his First Amended Complaint show that, although the affair was common knowledge in Lansing political circles, it was of no concern to the House Defendants.  (ECF No. 33-10 at PageID.1404–05, 1410–11 (Defendant Saari interview with the Michigan State Police).)  And one is compelled to ask, why would Defendant Bowlin terminate Allard and Graham's employment when, according to Courser, Allard and Graham were an integral part of the alleged conspiracy?  Moreover, Allard and Graham's conduct in sharing the May 19, 2015, recording with the *Detroit News*, after Defendant Saari and others declined to act on the information, undermines the existence of an agreement or a common design between the House Defendants and Allard and Graham as to Courser and Gamrat.  Finally, the public record shows that Courser's claim that the House Defendants conspired to bring criminal charges against him is patently absurd, given that a Democrat, Representative Andy Schor, introduced House Resolution No. 145 to refer the HBO investigation to the Michigan Attorney General and the Michigan State Police.[9]

Turning to Courser's factual allegations, while Courser alleges specific facts relating to a conspiracy, none of them concern the House Defendants.  Rather, Courser's allegations concern actions by Allard, Graham, Cline, and Joe Gamrat.  Courser makes general allegations that Allard, Graham, and Cline met with Defendants Saari and Swartzle at various times, but he alleges no fact establishing that the House Defendants told Allard, Graham, and Cline to eavesdrop, surveil, or wiretap Courser or Gamrat.  Moreover, Courser alleges no fact (as opposed to conclusions) showing that the House Defendants agreed among themselves to conspire against Courser and

---

ECF No. 33 at PageID.442.)  Under these circumstances, the Court may consider the police report.  *See English v. Williams*, Nos. 08-11171, 08-11428, 2009 WL 3698556, at *4 (E.D. Mich. Nov. 3, 2009) (considering a police report that was central to the complaint in deciding a motion to dismiss).

[9] http://www.legislature.mi.gov/(S(xcq1veves3svkr2qw43m1bv3))/documents/2015-2016/Journal/House/pdf/2015-HJ-09-11-071.pdf.

Gamrat.  The gist of Courser's claim is that because all House Defendants somehow participated in the investigation, they must have conspired against him.  But even the evidence Courser cites does not support his allegations.  For example, in paragraph 58, Courser states:  "Immediately, members of COTTER's team, including SAARI and SWARTZLE began meeting with Defendants' employees Allard, Graham, and Cline in order to direct them to gather information against COURSER."  In subparagraph d, Courser alleges that Jessica Jeurink, the coordinator for Cotter's office in April 2015, wrote to Cline, "Keep me posted on all fronts."  (ECF No. 33 at PageID.404.)  But Exhibit 11, which Courser cites, shows that Jeurink was simply asking Cline to keep her posted on the job opportunities that Cline was exploring.  (ECF No. 33-11 at PageID.1422.)  In short, Courser alleges nothing more than conduct that was "not only compatible with, but indeed was more likely explained by, lawful, unchoreographed . . . behavior."  *Iqbal*, 556 U.S. at 680, 129 S. Ct. at 1950.

Finally, Courser's repeated allegations that Allard, Graham, and Cline were "Defendants' employees," in a not-so-veiled effort to impose vicarious liability on the individual House Defendants, are unavailing.  Under Michigan law, "a master is responsible for the wrongful acts of his servant committed while performing some duty within the scope of his employment."  *Rogers v. J.B. Hunt Transp., Inc.*, 466 Mich. 645, 651, 649 N.W.2d 23, 26 (2002).  As Courser admits, Allard, Graham, and Cline were employed by the House, not the individual Defendants.  (ECF No. 33 at PageID.402.)  Accordingly, vicarious liability could only be imposed against the House, which, of course, is immune from suit under the Eleventh Amendment.

### 2.   Section 1983 Claim

Courser's § 1983 claim has several facets:  a procedural due process claim, a substantive due process claim, an equal protection claim, and a Fourth Amendment claim.

### *Procedural Due Process*

In order to state a procedural due process claim, a plaintiff must show that "(1) he had a life, liberty or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006).

As an initial matter, Courser testified before the Select Committee that the process was "absolutely fair."[10]  Obviously, Courser changed his tune when he filed his first lawsuit.  But beyond Courser's own words, in *Gamrat*, this Court held that a public official does not have a property interest in an elected office.  320  F. Supp. at 3d 937–38.  Courser does not argue that he had a property interest in his office, but instead, citing various paragraphs of his First Amended Complaint, says that he was deprived of a liberty interest.  (ECF No. 48 at PageID.2470.)  Courser does not state what that liberty interest is, nor does he cite a case supporting the proposition that he had a liberty interest.  Courser's claim fails for this reason.

Moreover, as this Court explained in *Gamrat*, any claim against the House Defendants based on their participation or assistance in the House/Select Committee investigation and the vote of the entire House regarding Courser's qualifications (as to which Courser resigned before a vote) are barred by absolute legislative immunity.  320 F. Supp. 3d at 936.  Similarly, as this Court also held in Gamrat, all House Defendants are entitled to qualified immunity as to this claim, as Courser fails to show that any House Defendant violated a clearly established right.  *Id.* at 938.

---

[10] Courser's testimony before the Select Committee is publicly available and may be considered on a motion to dismiss.  *See* http://www.house.mi.gov/SharedVideo/PlayVideoArchive.html?video=EXAM-090915.mp4.

### Substantive Due Process

Courser alleges that "Defendants' conduct deprived COURSER of liberty and failed to respect decencies of civilized conduct to the extent that it 'shocks the conscience.'" (ECF No. 33 at PageID.461.)  "Substantive due process affords only those protections so rooted in the traditions and conscience of our people as to be ranked as fundamental." *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 8 (6th Cir. 2012).  Courts generally employ the "shocks the conscience" test in analyzing substantive due process claims.  Conduct shocks the conscience when it "violates the decencies of civilized conduct," which "includes actions so brutal and offensive that they do not comport with traditional ideas of fair play and decency."  *Range v. Douglas*, 763 F.3d 573, 589 (6th Cir. 2014) (internal quotation marks omitted).

Courser fails to allege a substantive due process claim.  Although Courser states that "[t]he First Amended Complaint is littered with specific facts" establishing his substantive due process claim, (ECF No. 48 at PageID.2471), most of the allegations pertain to Allard, Graham, and Cline.  Courser's allegations against Defendants offer nothing more than conclusions that do not rise to the level of a substantive due process violation.  In addition, legislative and qualified immunity both bar the substantive due process claim.

### Equal Protection

Courser alleges that Defendants violated his right to equal protection because they treated him less favorably than other similarly-situated legislators who were not "constructively expelled" from the House.  "To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis."  *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (internal quotation marks omitted).  The House Defendants argue that Courser's claim fails because he does

19

not allege that he was part of a suspect class or that the House Defendants discriminated against him for an unlawful reason.  Conceding this point, Courser says that he has a claim under the class-of-one theory articulated in *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S. Ct. 1073 (2000) (per curiam).  However, Courser cannot avail himself of the class-of-one theory.  In *Enquist v. Oregon Department of Agriculture*, 553 U.S. 591, 128 S. Ct. 2146 (2008), the Supreme Court held that the class-of-one theory has no application in the public employment context.  *Id.* at 603–04, 128 S. Ct. at 2154.  The Court reasoned that unlike non-employment decisions, governmental employment decisions involve discretionary decisionmaking that take into account "a vast array of subjective, individualized assessments."  *Id.* at 603, 128 S. Ct. at 2154.   The same rationale extends to a legislature's imposition of member discipline, for the Supreme Court has said that a legislature's discipline of a member is part of its "inherent power of self-protection" to deal with its own members' misbehavior.  *In re Chapman*, 166 U.S. 661, 668, 17 S. Ct. 677 (1897).  Courser was not only an employee (as he admits in his First Amended Complaint), but was also part of a legislative body possessing broad discretion to discipline its members.

In addition, even if the class-of-one theory were available to Courser, legislative immunity and qualified immunity both bar the equal protection claim.

### Fourth Amendment

Finally, Courser alleges a Fourth Amendment claim based on the House Defendants' alleged illegal recording of Courser's conversations without his knowledge or consent.  This claim fails as well because it is based on recording by persons other than the House Defendants. Moreover, this Court held in *Gamrat* that Graham's recording of his "inoculate the herd" conversation with Courser and Gamrat did not violate federal or state law.  320 F. Supp. 3d at 945. Courser also fails to explain how a recording by a person who was lawfully part of the conversation could be a seizure under the Fourth Amendment.   Moreover, because the Court has already

20

concluded that Courser's conspiracy allegations are insufficient to support a conspiracy claim against the House Defendants based on non-parties' recording, surveilling, and extorting Courser, Courser's attempt to impute such activities to the House Defendants fails.

Finally, the House Defendants are entitled to quailed immunity on the Fourth Amendment portion of Courser's § 1983 claim as well.

### 3.    Section 1985 Claim

 Section 1985 contains three subsections.  Courser alleges that Defendants violated subsections (1) and (3).  Subsection (1) prohibits interference with federal officers in the performance of their duties. *See Fox v. Mich. State Police Dep't*, 173 F. App'x 372, 376 (6th Cir. 2006) (noting that "Section 1985(1) . . . prohibits conspiracies to interfere with federal officers in the performance of their duties").  Subsection (3) applies to "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Vakilian v. Shaw*, 335 F.3d 509, 518 (6th Cir. 2003). In regard to § 1985(3) claims, the Sixth Circuit has repeatedly held that a plaintiff must also allege that "the conspiracy was motivated by racial, or other class-based, invidiously discriminatory animus." *Moniz v. Cox*, 512 F. App'x 495, 499 (6th Cir. 2013).

Because Courser was not a federal officer, he cannot maintain a claim under § 1985(1). Courser fails to allege a claim under § 1985(3) because he does not allege that the conspiracy (again, his allegations fail to establish a conspiracy) was motivated by racial, or other class-based animus.  In his response, Courser says that he alleges a claim under § 1985(2), which prohibits conspiracies to interfere with the enforcement of rights in state courts.  *See Willing v. Lake Orion Cmty. Schs. Bd. of Trs.*, 924 F. Supp. 815, 819 (E.D. Mich. 1996).  However, Courser alleges no

such claim in his First Amended Complaint.  In any event, Courser fails to state a claim because his allegations concern the House investigation and expulsion hearing, not the state-court criminal proceedings.

4.     **Federal Wiretapping Act and Michigan Eavesdropping Statute**

This claim fails for several reasons.  First, the Federal Wiretapping Act is subject to a two-year statute of limitations.  18 U.S.C. § 2520.  And, as Defendant Saari notes, assuming that tolling applies, *Courser I* was pending for 95 days.[11]  Accounting for tolling, Courser would have to allege facts occurring after May 4, 2016, to have a timely claim.  He does not do so.  And, even applying the discovery rule—which is a matter of federal law, *see Mich. United Food & Commercial Workers Unions & Drug & Mercantile Emps. Joint Health & Welfare Fund v. Muir Co.*, 992 F.2d 594, 598 (6th Cir. 1993)—Courser knew of his claim when he filed *Courser I* in 2016.  Moreover, Courser was a participant in the May 19, 2015, "inoculate-the-herd" conversation, had heard the edited version by the time of the Select Committee hearing, and should have been well aware of any alleged edits.

Second, Courser's claim depends entirely upon his conspiracy allegations which, as discussed above, are insufficient to allege that the House Defendants participated in a conspiracy.

Third, this Court held in *Gamrat* that Graham did not violate federal or state law by recording the "inoculate-the-herd" conversation, in which he, Courser, and Gamrat were participants.

Finally, to the extent Courser claims that the House Defendants used unauthorized recordings in the HBO report and Select Committee proceedings, they are entitled to legislative immunity.

---

[11] Tolling likely does not apply.  The Sixth Circuit has observed that "[i]t is generally accepted that a dismissal without prejudice leaves the situation the same as if the suit had never been brought, and in the absence of a statute to the contrary a party cannot deduct from the period of the statute of limitations the time during which the action so dismissed was pending."  *Wilson v. Grumman Ohio Corp.*, 815 F.3d 26, 27 (6th Cir. 1987).

### 5.     Violation of 18 U.S.C. § 1030 and M.C.L. § 752.791

Immediately after the *Detroit News* broke the Courser and Gamrat story, Defendant Swartzle placed a "litigation hold" on all potentially relevant materials, which entailed, among other things, seizing the House-owned computers assigned to Courser and Gamrat.  (ECF No. 33 at PageID.530.)  In Count 6, Courser alleges that the House Defendants violated the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030(a), when they accessed his work computers.

The CFAA claim fails for several reasons.  First, the claim is time-barred.  The CFAA has a two-year limitations period that commences "the date of the act complained of or the date of the discovery of the damage."  18 U.S.C. § 1030(g).  Courser's computer was seized in August 2015, and Courser was aware of that fact.  Although Courser argues that his claim is timely because he only received the evidence related to the computer information that supports his CFAA claim in May 2017, Courser was nonetheless aware of the seizure of the computer in August 2015 and believed it was illegal.  He alleged as much in his complaint in paragraph 492 of his Complaint in *Courser I*.  *See  Courser I*, No. 1:16-CV-1108, ECF No. 1 at PageID.84.

Second,  Courser fails to state a claim under the CFAA.  The CFAA is a criminal statute that has been amended to permit "[a]ny person who suffers damage or loss by reason of a violation of [the statue]" to "maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."  18 U.S.C. § 1030(g).  Courser may pursue a civil remedy only if the House Defendants caused a "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value."  18 U.S.C. § 1030(c)(4)(A)(i)(I).  The term "loss" means "any reasonable cost to any victim, including the cost of . . . conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost . . . because of interruption of service."  18 U.S.C. § 1030(e)(11).  Courser fails to allege how he incurred any reasonable cost in remedying the House Defendants' conduct,

particularly since the computers the House Defendants seized and searched belonged to the House, not Courser. (HBO Report at 623, 741.)

Courser's claim under the Michigan Fraudulent Access to Computers, Computer Systems, and Computer Networks Act, M.C.L. § 752.791, *et seq.*, fails because the Act is a criminal statute that does not provide a private cause of action. *Garback v. Lossing*, No. 09-cv-12407, 2010 WL 3733971, at *8 (E.D. Mich. Sept. 20, 2010).

### 6. Libel, Slander, and Defamation

In Count 7, Courser alleges a claim of defamation. The elements of a defamation claim are:

> (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication.

*Ghanam v. Does*, 303 Mich. App. 522, 544, 845 N.W.2d 128, 142 (2014). Courser's defamation claim is based on Allard and Graham delivering a "fabricated" recording of the "false flag" conversation to the *Detroit News*, knowing that the recording was edited.

Courser's defamation claim—perhaps the most specious of all his claims— is subject to dismissal for several reasons. First, it is barred by the one-year statute of limitations applicable to defamation claims. M.C.L. § 600.5805(9). Courser's claim would have accrued in August 2015, when the allegedly unlawful act occurred. Courser argues that he did not discover conclusive proof that the tapes had been fabricated (as he describes it) until May 2018. But this argument lacks merit, because the statute starts to run based on dissemination, not discovery of fabrication. Courser could certainly have alleged this claim much earlier, within the limitations period.[12]

---

[12] The one-year limitations period runs from the date the defamatory statement was made and is not extended by republication. *Mitan v. Campbell*, 474 Mich. 21, 25–26, 706 N.W.2d 420, 422 (2005).

Moreover, Courser cannot reasonably assert that the allegedly "fabricated" recording, by which Courser really means "edited," was false.  Courser acknowledged before the Select Committee that his voice was on the tape and that he made the statements attributed to him on the recording.

Second, Courser fails to allege facts showing that any of the House Defendants ordered Allard or Graham to transmit the "false flag" recording to the *Detroit News*.  Once again Courser's conclusory allegations are insufficient to support his claims.

Finally, to the extent Courser seeks to impose liability against the House Defendants for use of the "inoculate-the-herd" recording during the House investigation, such claim is barred by both absolute legislative immunity, *see People v. Courser*, 326 Mich. App. 298, 306–09, 926 N.W.2d 299, 305–06 (2018), as well as governmental immunity.

### 7. Civil Stalking

In Count 8 Courser alleges that the House Defendants violated Michigan's civil stalking statute, M.C.L. § 750.411h.  This claim fails because Courser fails to allege that the House Defendants did anything that constitutes stalking under the statute, and the Court has already concluded above that Courser fails to allege facts imputing non-parties' acts to the House Defendants.

### 8. Invasion of Privacy and Intrusion on Seclusion

As with Courser's other claims, this one is based on his theory that the House Defendants conspired with Allard, Graham, and Cline.  Although Courser's claim could be construed to address all four types of invasion under the common law right of privacy, in his response, Courser limits his claim to intrusion upon seclusion.  Such a claim has the following elements:  (1) the existence of a secret and private subject matter; (2) a right possessed to keep that subject matter private; and (3) the obtaining of information about that subject matter through some method

objectionable to a reasonable person.  *See Dalley v. Dykema Gossett*, 287 Mich. App. 296, 306, 788 N.W.2d 679, 687 (2010).

This claim fails because Courser does not allege that the House Defendants did anything to obtain Courser's secret or private information.  As explained above, Courser fails to allege a basis to hold the House Defendants liable for the acts of non-parties.  Moreover, this Court has already held that Graham lawfully recorded the "inoculate-the-herd" conversation, *Gamrat*, 320 F. Supp. 3d at 945, and the HBO Report used the information in that recording only after it had been reported by the *Detroit News* and other news outlets and, thus, was no longer private.

Finally, this claim is barred by governmental immunity and, to the extent Courser asserts that the violation occurred during the House investigation, it is also barred by absolute legislative immunity.

### 9.    Tortious Interference

Courser alleges in Count 10 that the House Defendants are liable for tortious interference with his business relationships.[13]  The elements of such a claim are:  "(1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted."  *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 268 Mich. App. 83, 90, 706 N.W.2d 843, 849 (2005).

Courser fails to allege facts supporting such a claim against the House Defendants.  He did not identify a single relationship that the House Defendants jeopardized, nor does he allege that

---

[13] As the House Defendants note, it appears that this claim may have been left over from Courser's prior case because Courser alleges that "Defendants were aware that they were publishing misleading and defamatory articles," which appears directed at the *Detroit News*, a defendant in *Courser* I.

the House Defendants knew of any specific business relationships that their investigation would damage.  Moreover, because the only publication the House Defendants made is the HBO report, the House Defendants are protected by legislative and governmental immunity.

### 10.    Intentional and Negligent Infliction of Emotional Distress

Courser's intentional infliction of emotional distress claim in Count 11 fails for a number of reasons.  First, a plaintiff can establish an intentional infliction of emotional distress claim only if the defendant's conduct was "extreme and outrageous."  *Hayley v. Allstate Ins. Co.*, 262 Mich. App. 571, 577, 686 N.W.2d 273, 276 (2004).  "The conduct complained of must be so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  *Id.* (internal quotation marks omitted).  Here, absent the alleged conspiratorial acts of non-parties, which cannot be imputed to the House Defendants, the House Defendants' conduct does not rise to this level of malfeasance.

Second, to the extent Courser's claim depends on conduct during the HBO or Select Committee investigations, the House Defendants are entitled to legislative immunity.

Finally, this claim is also barred by governmental immunity.

As for Courser's negligent infliction of emotional distress claim, in Michigan, such claims are limited to "bystander recovery"—where a plaintiff witnesses negligent injury to a third person and suffers mental disturbance as a result.  *Hayes v. Langford*, No. 280049, 2008 WL 5158896, at *4 (Mich. Ct. App. Dec. 9, 2008) (per curiam).  Courser fails to allege that he witnessed an injury to a third person.  Moreover, this claim is also barred by both legislative and governmental immunities.

### 11.     Fraudulent Misrepresentation

In Count 14 Courser alleges that Defendants Swartzle and Beydoun knowingly misrepresented to him that if he appeared at the Select Committee hearing and met with Bowling, his interests would be protected and he would only be censured, and his statements would remain private. In *Gamrat*, in addressing Gamrat's similar claims, this Court said that "no reasonable person with even a rudimentary understanding of the political system could believe that one or two individuals—the Speaker and/or the Majority Counsel—could guarantee votes, particularly on an issue as sensitive as censuring or ejecting a member." 320 F. Supp. 3d at 939. The same is true with Courser's fraudulent misrepresentation claim in the instant case. Because Michigan law requires that reliance on an alleged misrepresentation must have been reasonable in order to hold a defendant liable for fraudulent misrepresentation, *see MacDonald v. Thomas M. Cooley Law Sch.*, 724 F.3d 654, 662–63 (6th Cir. 2013), as a matter of law, Courser cannot establish the reliance element of his claim.[14]

In addition, Courser's fraud claim is barred by legislative and governmental immunity.

### 12.     RICO and RICO Conspiracy

In Count 15 Courser alleges that Defendants violated RICO, and in Count 16 Courser alleges that Defendants engaged in a conspiracy to violate RICO.

Although Courser cites 18 U.S.C. § 1962(a), (b), and (c) in Count 15, Courser's only possible claim is for violation of 18 U.S.C. § 1962(c), which prohibits conducting an enterprise through a pattern of racketeering. Courser's RICO claim fails for one glaring reason, which Courser fails to address in his response. That is, in order to establish a violation of § 1962(c), a plaintiff must demonstrate a pattern of racketeering. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479,

---

[14] Courser's allegation that Swartzle and Beydoun were acting as his attorneys is specious. Courser—an attorney himself—had is own counsel during the Select Committee investigations and Courser should have known that in their respective capacities Swartzle and Beydoun did not represent Courser individually.

496, 105 S. Ct. 3275, 3285 (1985).   To establish a pattern, a plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 2900 (1989) (italics in original).

Continuity may be either closed-ended or open-ended.  *Id.* at 241, 109 S. Ct. at 2902.  Open-ended continuity exists where there is a distinct threat of long-term racketeering activity or the predicate acts or offenses are a part of the entity's regular way of doing business.  *Aces High Coal Sales, Inc. v. Cmty. Bank & Trust of W. Ga.*, 768 F. App'x 446, 456 (6th Cir. 2019).  In a closed-ended situation, the plaintiff must show a series of related predicates extending over a substantial period of time.  Acts extending over a few weeks or months do not suffice.  *Id.* at 457.  In either case, there must be a threat of future criminal conduct.  If the alleged scheme involved a single scheme and a single goal, the continuity requirement is not met.  *Id.*

Courser cannot establish continuity under either theory.  Here, Courser alleges a scheme that lasted no more than nine months and had but a single purpose and victim—to remove Courser from office.  The alleged scheme was complete once Courser resigned, as nothing else remained to be done.  Because the single purpose was accomplished, no threat of alleged future criminal activity remained.  *See Vemco, Inc. v. Camardella*, 23 F.3d 129, 134–35 (6th Cir. 1994) (concluding that the continuity requirement was not satisfied because the instrumentality was a single construction job with a single victim and the scheme was complete once the defendant received the money it was requesting in the billing statements); *Thompson v. Paasche*, 950 F.2d 306, 311 (6th Cir. 1991) ("Paasche's fraudulent scheme was an inherently short-term affair.  He had nineteen lots to sell.  Once he had sold all of the lots, the scheme was over.  It had to be, he had no more land to sell.  Thus, his scheme was, by its very nature, insufficiently protracted to qualify as a RICO violation.").  Courser thus fails to state a RICO claim.

In addition, because Courser does not establish a RICO claim, he also fails to establish a RICO conspiracy.  *See Craighead v. E. F. Hutton & Co.*, 899 F.2d 485, 495 (6th Cir. 1990) ("Plaintiffs' conspiracy claim cannot stand in light of the dismissal of their other RICO counts.").

### 13.   Spoliation

Last, in Count 17, Courser alleges a claim for the tort of spoliation.  However, Michigan courts refuse to recognize the stand-alone tort of spoliation.  *Teel v. Meredith*, 284 Mich. App. 660, 663, 774 N.W.2d 527, 529 (2009).  Moreover, although Courser generally alleges that the House Defendants modified some information that was on the computer that the House loaned him, he does not state what the information was.  Courser also fails to show that he was disadvantaged by whatever was modified or deleted.  This claim, like the others, fails.

## C.   Rule 37 Motion for Sanctions

Shortly before oral argument was scheduled on the instant motions to dismiss, Courser filed a motion pursuant to Federal Rule of Civil Procedure 37 based on alleged destruction and/or spoliation of evidence.  (ECF No. 61.)  The motion presents essentially the same grounds as Courser's spoliation claim in Count 17.

The basis for Courser's motion is that after the *Detroit News* article was published, Defendant Swartzle put a "litigation hold" on Courser's, Gamrat's, and their staff's computers. Swartzle asked Defendant Bowlin to obtain all hard files and onsite computers, and Bowlin complied.  Courser alleges that "[b]etween August 6, 2015, and September 11, 2015, while in the possession of the House, items were deleted, overwritten, tampered with, manipulated, destroyed, and then 'bleached' so that they can never be recovered."  (*Id.* at PageID.2621.)

On Monday, August 10, 2015, around 8:00 a.m., Catherine Hunter, the Director of Information Systems for the House, took possession of the collected computers and began processing them.  She plugged each computer into a power outlet using a computer charger.  She

then logged onto the computer using her administrator credentials; plugged in an external hard drive to the computer via a USB Port; copied all "local user files" to the hard drive; turned off the computer, unplugged it, and put it in a designated place in her office. (ECF No. 33-74 at PageID.2087.) Hunter took all of these steps as part of the House's routine procedure or protocol. (*Id.* at PageID.2088.) While processing the computers, Hunter did not prevent them from accessing the House's WiFi network, and she may have plugged them into the network via an ethernet cable. (*Id.* at PageID.2087, 2089, 2092.) As a result, the computers' operating system and antivirus software, Kaspersky, began updating. (*Id.* at PageID.2090.) All computers remained in Hunter's office until the Michigan State Police picked them up on September 11, 2015. (*Id.* at PageID.2087.) Hunter is certain that she was the only person who had access to the computers while they were stored in her office. (*Id.* at PageID.2091.)

Courser alleges that the House did the following to the computers: (1) accessed, modified, deleted, and wrote over "files"; (2) deleted the "Lync messaging program used by" Courser, Gamrat, and their staffs; (3) removed, overwrote, and "bleached" files using a computer program called Kaspersky; and (4) locked the computers with BitLocker. (ECF No. 61 at PageID.2623.)

Courser brings his motion pursuant to Federal Rule of Civil Procedure 37(e), which addresses a party's failure to preserve electronically-stored information "that should have been preserved in the anticipation or conduct of litigation because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." As a remedy for the alleged violations, Courser requests that the Court: (1) hold that the House destroyed or failed to preserve evidence and that Courser has been prejudiced by the loss of such information; (2) order the House Defendants to restore the information and communications and then produce it to Courser; (3) find that the House Defendants acted with intent to deprive Courser of the information; (4) grant judgment in Courser's favor; and (5) award Courser his costs and attorney's

fees.  (ECF No. 61 at PageID.2623.)  "Rule 37(e)(2) sanctions are available to address the prejudicial effect of lost [electronically-stored information] only if the loss is shown to have been motivated by an intent to deprive another party of the information's use in litigation."  *Culhane v. Wal-Mart Supercenter*, 364 F. Supp. 3d 768, 773 (E.D. Mich. 2019).

The Court rejects Courser's motion for several reasons.  First, Courser cannot show that the information was lost due to a lack of reasonable efforts to maintain it.  That is, a party is not required to retain every piece of information, regardless of its relevance, and Courser fails to show that the items the House Defendants failed to preserve are relevant.  In spite of Courser's claim that thousands of computer files were modified, deleted, or added, Ms. Hunter testified that she did not do any of those things and simply followed the House's litigation hold protocol.  Only the operating system files were updated.  In addition, it is not clear how deletion of the Lync program is relevant, and while the House used the Kaspersky antivirus software, it did not use Kaspersky file shredding software, as Courser claims.  And, Courser fails to explain why Bitlocker software, which *protects* information, is relevant to this litigation.  Finally, as to a duty to preserve, Courser fails to show that the House had any reason to anticipate the instant litigation when Ms. Hunter sought to preserve the evidence on Courser's and Gamrat's computers.

Second, to the extent Courser seeks replacement of the lost information, the House Defendants note that the information Courser claims was lost can be quickly and easily replaced.

Third, Courser fails to allege prejudice; he does not even attempt to explain what information was deleted that may have been useful to him.  The answer is likely nothing.  For example, in spite of Courser's specious claim that the "inoculate-the-herd" recording was "fabricated," Courser and Gamrat both admitted during the Select Committee proceedings that they said and did what was portrayed on the recording.  This is why Courser and Gamrat were investigated and why Courser resigned and Gamrat was ultimately expelled.  Moreover, Courser

does not even attempt to explain why he would have evidence of the House Defendants' alleged conspiracy on his House-loaned computer.

Finally, Courser fails to demonstrate that the House Defendants acted with an intent to deprive Courser of information, particularly information having some relevance to Courser's claims. Rule 37(e)(2) allows the imposition of most of the sanctions that Courser requests "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation." Nothing in the record indicates that the House Defendants intended to deprive Courser of information relating to this litigation.

## V.  Conclusion

For the foregoing reasons, the Court will grant the House Defendants' (including Defendant Saari) motions to dismiss and dismiss Courser's First Amended Complaint in its entirety. In addition, the Court will deny Courser's motion for sanctions pursuant to Rule 37(e).

An Order consistent with this Opinion will enter.


Dated:  July 11, 2019                                    /s/ Gordon J. Quist
                                            _____
                                                  GORDON J. QUIST
                                            UNITED STATES DISTRICT JUDGE